## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SHEILA BUCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-CV-0295-CVE-SH |
| | ) | |
| C.J. RHOADES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court is the motion of Defendant City of Tulsa (the "City"), seeking a protective order to preclude the deposition of Mayor G.T. Bynum (the "Mayor"). Given the Mayor's alleged personal involvement in planning for the rally at issue and unique knowledge of lead-up to the event, the Court finds a four-hour deposition appropriate in the specific circumstances of this case. The City's motion will be denied.

### Background

This action centers on the City's alleged violation of Plaintiff Sheila Buck's constitutional rights during her attendance of a campaign rally for President Donald J. Trump.[1] In June 2020, with only a few days' notice, the Mayor learned that President Trump would be hosting a campaign rally at the BOK Center in downtown Tulsa. (*See* ECF No. 93-12 ¶ 3;[2] ECF No. 98-5.[3]) According to the Amended Complaint, Donald J.

---

[1] The facts, as alleged in Plaintiff's complaint, are more fully summarized in District Judge Claire V. Eagan's ruling on the parties' motions to dismiss. (*See* ECF No. 57 at 2-4.)

[2] Affidavit of G.T. Bynum: "On . . . June 15, 2020, I learned that . . . Trump intended to hold a rally . . . . My office received a telephone call from Tulsa Police Chief Wendell Franklin who indicated he had been notified by the [United States] Secret Service that the President wanted to hold a rally in Tulsa on June 19, 2020."

[3] Bynum Facebook post of June 16, 2020: "I didn't even know the invitation had been extended until BOK Center management contacted the City regarding Police support for the event."

Trump for President, Inc. (the "Trump Campaign") did not seek a special event permit to block off city streets for private purposes, nor could it, as such applications must be filed 45 days prior to any event.  (ECF No. 1 ¶¶ 37-38.)  The Mayor agrees that, given the short notice, there was no time for the Trump Campaign to obtain a permit (ECF No. 93-12 ¶ 4), and it is undisputed that no permit was granted.[4]

On June 18, 2020, in anticipation of crowds in excess of 100,000—and in light of protests that were happening around the country—the Mayor issued an executive order noting the establishment of a "federal exclusion zone," declaring a civil emergency, and setting a curfew for the blocks surrounding the BOK Center.  (ECF No. 93-10.)  This order restricted access and activities in the zone from June 18, 2020, to June 21, 2020.  (*Id.*)  On June 19, 2020, the Mayor spoke with President Trump about the rally.  (*See* ECF Nos. 98-3, 98-7 at 2.)  That same day, the Mayor also rescinded the executive order, apparently as a result of this discussion.  (ECF Nos. 93-11,[5] 98-3,[6] 98-7 at 2.[7])  The Tulsa Police Department ("TPD") stated that, in lieu of the executive order, the Secret Service had established a secure zone comprising the streets surrounding the BOK Center.  (ECF No. 98-3.)  Lieutenant Chris Witt testified that, within a "sterile area" inside this secure zone, if Trump Campaign members asked to have people removed because of their attire or

---

[4] *See also* Tulsa, Okla., Code of Ordinances tit. 37, ch. 14 (2018) (outlining the process for permitting special events), available at https://library.municode.com/ok/tulsa/codes/code_of_ordinances?nodeId=CD_ORD_TIT37TURETRCO_CH14SPEV (last visited Feb. 16, 2023).

[5] Executive Order No. 2020-12: "a curfew is no longer imminently necessary and expedient to protect the health, safety, welfare and public peace and to preserve lives and property."

[6] Tulsa Police Department Facebook post: "after discussing it with President Trump, Mayor Bynum decided to rescind his Executive Order."

[7] President Trump tweet: "I just spoke to . . . Mayor of Tulsa, G.T. Bynum, who informed me there will be no curfew tonight or tomorrow . . . ."

protesting, the TPD's operating practice was to ask such persons to leave and, if they did not, to arrest them.  (ECF No. 98-4 at 52:6-53:14, 69:12-21.)

On June 20, 2020, Plaintiff attended the rally after buying a ticket.  (ECF No. 1 ¶ 17.)  Plaintiff was wearing a black T-shirt reading "I Can't Breathe" and all black clothing that referred to the television show, "Watchmen."  (ECF No. 93-5 at 36:10-37:20.)  After entering the secured zone—though still on a public street—Plaintiff was asked to leave by the Trump Campaign's private security and, later, by TPD.  (ECF No. 93-7 at 2, 4.)  When Plaintiff refused to exit the secured area, she was arrested.  (*Id.*)

Plaintiff asserts claims under 42 U.S.C. § 1983 against the City and the arresting TPD officers.[8]  (*See generally* ECF No. 1.)  On January 13, 2023, Plaintiff noticed the deposition of the Mayor.  (ECF No. 93-8.)  The City objects, arguing that the deposition would be unduly burdensome under Rule 26(c)(1) and the "apex doctrine."  (ECF No. 93.)  For reasons set forth below, the undersigned disagrees.

## Analysis

### I.     Legal Standard

A party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case".  Fed. R. Civ. P. 26(b)(1).  Evidence is relevant if it has any tendency to make a fact of consequence in the action "more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Still, even discovery into relevant evidence is not unlimited.  A court must limit discovery it determines "is unreasonably cumulative or duplicative, or can be obtained from some

---

[8] Plaintiff's claims against the other defendants, along with her free exercise claim against the City and the arresting TPD officers, have previously been dismissed.  (*See* ECF Nos. 39, 57, 63, 82.)

other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). Further, a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including forbidding the discovery or limiting it to certain matters. Fed. R. Civ. P. 26(c)(1); *see also id.* 26(b)(1) (proportionality includes "whether the burden or expense of the proposed discovery outweighs its likely benefit"). Traditionally, the "party seeking a protective order has the burden of showing good cause for its issuance." *Okla. ex rel. Edmondson v. Tyson Foods, Inc.*, No. 05-CV-329-GKF-PJC, 2009 WL 10694083, at *2 (N.D. Okla. Apr. 24, 2009). However, when addressing proportionality, the party claiming undue burden generally has better information with respect to that determination, while the party making the request generally should be best able to explain how the information is relevant. *See* Fed. R. Civ. P. 26, advisory ctte.'s note to 2015 am.

These Rule 26 precepts are encompassed in the so-called "apex doctrine," which the City argues applies here. While the doctrine "has not been addressed by the Tenth Circuit, . . . it has been applied by a variety of federal district courts nationwide." *Tierra Blanca Ranch High Country Youth Program v. Gonzales*, 329 F.R.D. 694, 696 (D.N.M. 2019). The "'apex doctrine' provides some protection from depositions to high-level executives and government officials" by recognizing that depositions "severely burden[] those officers and the entities they represent, and that adversaries might use this severe burden to their unfair advantage." *Id.* (quoting *United States ex rel. Galmines v. Novartis Pharms. Corp.*, No. 06-3213, 2015 WL 4973626, at *1 (E.D. Pa. Aug. 20, 2015)).

Courts generally use one of two approaches when considering the apex doctrine, although the factors in each are roughly the same. One approach, taken by some judges in this district, allows that motions regarding apex officials "are treated using the same

legal standards as apply to any other protective order," with the additional consideration of "special factors that . . . apply to such officials." [9] *Tyson Foods*, 2009 WL 10694083, at *2 (internal quotations omitted).  A second approach involves application of a rebuttable presumption that requiring a high-level official to sit for a deposition is an undue burden unless the official possesses special or unique (and relevant) information that cannot be obtained by a less intrusive method.  *See Tierra Blanca Ranch*, 329 F.R.D. at 697.  The Court finds that rigid adherence to a rebuttable presumption requiring specific findings is contrary to the Court's responsibility under Rule 26 to use "all the information provided by the parties" and consider the applicable factors "in reaching a case-specific determination of the appropriate scope of discovery."  Fed. R. Civ. P. 26, advisory ctte.'s note to 2015 am.

Still, the Court finds it appropriate to address the factors raised in prior decisions of this court (*see* n.9, *supra*) and in cases imposing a rebuttable presumption.  After the required finding of relevance, these include whether the executive has unique personal knowledge of the matter in dispute; whether the information sought from the executive can be obtained from another witness or through an alternative discovery method; and whether sitting for the deposition would serve as a severe hardship for the official in light of their company or governmental obligations.  *See Tierra Blanca Ranch*, 329 F.R.D. at 697-98.  Applying these factors, the Court finds that the City has not demonstrated an undue burden.

---

[9] These "special factors" include "the executive's knowledge of the issues in the case, the availability of others for deposition, the timing of the deposition request, and scheduling conflicts."  *Tyson Foods*, 2009 WL 10694083, at *2 (citing *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 483-84 (10th Cir. 1995)).  Some courts also focus on whether the apex witness has unique personal knowledge and whether other witnesses have been deposed first.  *Id.*

## II.     Relevance

The City argues that, because the Mayor was not present when Plaintiff was arrested, he "has no relevant information that cannot be ascertained elsewhere." (ECF No. 93 at 1.) This argument, however, focuses on the wrong period of time.

Plaintiff is asserting a *Pembaur*[10] claim against the City, alleging that implementation of municipal policy violated her First, Fourth, and Fourteenth Amendment rights. (*See* ECF No. 1 at ¶¶ 86-92; ECF No. 57 at 24.) "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution . . . and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). As for the first element, Judge Eagan has found that Plaintiff plausibly alleged a violation of her constitutional right of free speech and her right to be secure against unreasonable seizure. (ECF No. 57 at 7-13.)

As for the second element, a municipality may be said to have acted under color of state law when the injury is caused by "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy . . . ." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Judge Eagan, again, has found that Plaintiff plausibly alleged TPD had a policy of removing individuals from a public city street at the direction of a private organization and that such policy was implemented without regard to Plaintiff's right to be on the street, her First Amendment rights, or whether there was probable cause to seize, remove, or arrest her. (ECF No. 57 at 16.) Plaintiff is now seeking discovery to prove those plausible allegations.

---

[10] *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

It is reasonable to believe the Mayor has information relevant to whether such a policy or custom existed. The Supreme Court has made clear "that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480. These circumstances include when a "decisionmaker possesses final authority[11] to establish municipal policy with respect to the action ordered."[12] *Id.* at 481. A municipal policy or custom may take multiple forms, including "the decisions of employees with final policymaking authority" or "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Bryson v. Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010)).

As such, "municipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. Once Plaintiff has established that such a choice was made, she "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and

---

[11] "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority . . . ." *Pembaur*, 475 U.S. at 483.

[12] "To determine the identity of the final policymaker, we consider whether: 1) the official is meaningfully constrained by policies made by another; 2) the official's decisions are subject to meaningful review; and 3) the decisions are within the realm of the official's authority." *Dempsey v. City of Baldwin*, 143 F. App'x 976, 986 (10th Cir. 2005) (unpublished). Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

deprivation of federal rights." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

While the Mayor has no "first-hand information about [Plaintiff's] arrest" (ECF No. 93-12 ¶ 6), he appears to have first-hand knowledge of—at a minimum—the development (or not) of a City policy as alleged in Plaintiff's complaint. That is, while he asserts he "delegated the security preparations to TPD and the Secret Service" (*id.* ¶ 5), he was directly involved in rescinding the executive order that, according to the TPD, was replaced with the "secure zone" (ECF Nos. 93-11, 98-3), and was reportedly on a telephone call with Chief Franklin and Secret Service resident agent Douglas Farrell regarding possible arrests TPD would make at the rally (ECF No. 98-8 at 60:11-61:10). Moreover, the Mayor is the only City employee known to have been on the telephone call with President Trump that purportedly led to a change in the City's security approach. (ECF Nos. 98-3, 98-7 at 2.) It is reasonable to assume the two executives might have discussed the management of crowds and attendees at the rally, given that the executive order— which touched on exactly that—was rescinded shortly after the call. The Mayor's discussion with President Trump, the decisions he made,[13] and his communications with TPD—all could easily have a tendency to make it more or less probable that the City had the unconstitutional policy alleged in the complaint.

---

[13] "The Mayor shall be the chief executive and administrative officer of the city and shall . . . [p]reserve the peace and enforce the provisions of . . . all ordinances . . . [and] [p]rovide, administer, maintain, and operate all police . . . services and functions . . . ." 1989 Amended Charter, art. III, § 1.4, available at https://library.municode.com/ok/tulsa/codes/code_of_ordinances?nodeId=CD_ORD_1989AMCH_ARTIIITHMA_S1.4EXADPODU (last visited Feb. 16, 2023).

### III.    Proportionality and Undue Burden

Looking to the requirements of Rule 26 and the "apex" factors, the Court finds no undue burden in requiring the Mayor to sit for a four-hour deposition.  As noted above, it appears the Mayor has unique personal knowledge that cannot be obtained from other sources within the City.   Further, the other witnesses likely to have knowledge about applicable policies or customs, such as Chief Franklin, have already been deposed. Plaintiff argues Chief Franklin was unable to recall conversations he had with the Mayor about "the City's policies and practices for the 2020 Trump Campaign Rally," thereby leaving the Mayor as "the only available source of this relevant information."  (ECF No. 98 at 8.)   While Chief Franklin appears only to reference lack of recall for a single conversation (ECF No. 98-6 at 20:20-21:9), the City has filed no reply to refute the proposition that the Mayor has knowledge Chief Franklin has forgotten.  As such, the Court finds this factor weighs in favor of the Mayor's testimony.

Finally, because the City does not argue that the requested discovery can be obtained through an alternative method, the last factor the Court will consider is the hardship that sitting for a deposition will have on the Mayor's governmental obligations. The City generally maintains that the "Mayor's busy schedule does not allow for a four hour deposition without wreaking havoc on his schedule and cancelling previous engagements."  (ECF No. 93 at 7.)   However, the parties appropriately conferred on this issue and identified a day when the Mayor did have a free four-hour window, and Plaintiff has noticed the deposition for that time.  (*Compare* ECF No. 93-8 *with* ECF No. 98-9.)

Looking at the factors, the Court finds no undue burden imposed on the Mayor considering the unique circumstances of this matter, and finds that the discovery sought is proportional to the needs of the case.

## IV.    The City's Request for Alternative Relief

The City argues that "Plaintiff's counsel's claims that he needs four hours for the Mayor's deposition borders on sheer harassment." (ECF No. 93 at 6.)  If the deposition goes forward, the City requests the Court limit it to two hours and to the topic of the executive orders.  (*Id.* at 7.)  While this Court is cognizant that the Mayor has a busy schedule and numerous obligations, it does not find the request for a four-hour deposition to be harassing or in excess of the needs of this case.  The Court further finds the City's proposed topics to be artificially restrictive, given the relevant information potentially within the Mayor's knowledge.  The City has given the Court no reason to believe that Plaintiff's counsel will stray from relevant evidence or engage in behavior that is otherwise harassing.  The four-hour limit on the deposition should further restrain the parties from wasting too much time on irrelevant pursuits.

## Conclusion

IT IS THEREFORE ORDERED that Defendant City of Tulsa's Opposed Motion for Protective Order (ECF No. 93) is DENIED.

ORDERED this 16th day of February, 2023.


SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT