## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SHEILA BUCK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-CV-0295-CVE-SH** |
| | ) | |
| **C. J. RHOADES, in his individual capacity,** | ) | |
| **M.C. PARKER, in his individual capacity, and** | ) | |
| **CITY OF TULSA, OKLAHOMA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court are the following motions: Defendants C.J. Rhoades' and M.C. Parker's Combined Motion for Summary Judgment and Brief in Support (Dkt. # 112); Plaintiff's Motion for Partial Summary Judgment on Her Claims against Defendants Parker and Rhoades and Brief in Support (Dkt. # 114); Defendants' Opposed Motion to Stay Proceedings until Resolution of State Criminal Case (Dkt. # 110); Defendants C.J. Rhoades, M.C. Parker, and the City of Tulsa's Motion in Limine to Exclude Emails Regarding Sheila Buck's Arrest (Dkt. # 121); Defendants C.J. Rhoades, M.C. Parker, and the City of Tulsa's Motion in Limine to Exclude Regarding Text Messages Regarding Sheila Buck's Arrest (Dkt. # 122); and Defendants C.J. Rhoades, M.C. Parker, and the City of Tulsa's Motion in Limine to Exclude Mayor Bynum's Opinions Regarding Sheila Buck's Arrest (Dkt. # 123). This case arises out of the arrest of plaintiff Sheila Buck as she attempted to enter a campaign rally for former president Donald Trump that was held in Tulsa, Oklahoma on June 20, 2022. Defendants M.C. Parker and C.J. Rhoades argue that they had probable cause to arrest plaintiff for trespassing and obstructing an officer, and that this is a complete defense to plaintiff's claims under 42 U.S.C. § 1983. Dkt. # 112. Defendants also argue that Buck has no

evidence that Parker or Rhoades were acting with the intention or purpose of discriminating against Buck because she was exercising her right to free speech under the First Amendment. Dkt. # 138, at 3. Buck responds that she was engaged in a peaceful protest on a city street and she was not interfering with the campaign rally, and defendants engaged in prohibited viewpoint discrimination in violation of her First Amendment rights. Dkt. # 114, at 15-20. She also argues that police officers lacked probable cause to believe she was committing a crime, and she was wrongfully arrested in violation of her rights under the Fourth and Fourteenth Amendments. Id. at 21-23.

## I.

On June 15, 2020, the chief of the Tulsa Police Department (TPD), Wendell Franklin, received notice from the United States Secret Service (Secret Service) that Donald Trump would be holding a campaign rally in Tulsa. Dkt. # 112-4, 4-6. The campaign rally was originally set for June 19, 2020 at the Bank of Oklahoma Center (BOK Center) in Tulsa, but the event was moved back a day to June 20, 2020. Id. at 7. The entity organizing the campaign rally was Donald J. Trump for President, Inc. (the Trump Campaign), and this is a private entity that is unaffiliated with the federal government. Dkt. # 114-2, at 11. It is undisputed that the Trump Campaign did not seek or obtain a permit from the City of Tulsa for the campaign rally.[1] Dkt. # 114-1, at 6, 10.

The Trump Campaign hired Colorado Security Agency (CSA) to assist campaign staff with the removal of persons from events who were attempting to convey a message or idea that was

---

[1] Much of the parties' briefing is devoted to whether the Trump Campaign needed to obtain a city permit and the legal ramifications of the Trump Campaign's failure to request a permit. However, these legal issues are outside the scope of the factual background, and the Court will consider the legal issues associated with the Trump Campaign's lack of city permit later in this Opinion and Order if this issue is relevant to plaintiff's claims against Parker and Rhoades.

inconsistent or in opposition to the Trump Campaign.  Dkt. # 114-4, at 3; Dkt. # 114-5, at 2.  CSA

provided a memorandum to its employees concerning their role at Trump Campaign rallies:

> [CSA] has been hired by the Trump 2020 Campaign to assist campaign staff at
> Presidential political rallies/events throughout the United States.  Our function will
> be to identify and "un-invite" individuals attempting to attend or already in
> attendance at a rally whose behavior or attire is inconsistent with the messaging of
> the Trump 2020 Campaign.  **This is a staff function, not a security function.**

Dkt. # 119, at 3.  The memorandum explains the "essential elements' of uninviting a guest from a

campaign rally:

> **First, they have to be told by someone in authority (us) that they are no longer
> welcome at the party.  Second, they have to be asked to leave.**  Then they have a
> decision to make.  They can leave in accordance with the wishes of the host and the
> law or they can refuse to leave and are at that time breaking the law by "failing to
> quit" or trespassing.

Id.  CSA directed its employees not to use force or even put their hands on any person who refused

to comply with a request to leave a rally, and local police would handle the physical removal of a

person from a campaign rally.  Id. at 4.

TPD Special Event Coordinator Chris Witt met with a liaison from the Secret Service on

June 15, 2020 to begin planning for the campaign rally that was to take place on June 20, 2020.  Dkt.

# 112-3, at 8-9.  Witt testified in his deposition that he could not recall whether the Secret Service

liaison presented a written plan for event security, and Witt believes that he may have made

adjustments to an operations plan from a prior special event.  Dkt. # 132-1, at 3-4.  Witt's job

responsibilities included working with event planners and hiring off-duty or reserve officers to work

as on-duty officers for special events.  Dkt. # 112-3, at 6.  Witt also served as the supervisor for off-

duty officers hired to work special events.  Dkt. # 112-1, at 12. The Secret Service determined that

the BOK Center would be treated as a "restricted building[] or ground[]" on the day of the campaign

rally, pursuant to 18 U.S.C. § 1752(c).  Dkt. # 112-5, at 5-8.  The campaign rally was not deemed a National Special Security Event or an event of national significance, but the Secret Service was still obligated to protect the president during his visit to Tulsa.  Id. at 7-8, 22-23.  The Secret Service established a restricted zone that extended several blocks in all directions from the BOK Center, and the Secret Service used magnetometers, fencing, and law enforcement personnel from various agencies to provide protection within the restricted zone.[2]  Id. at 20-21.

Witt drafted an operations plan for the campaign rally, and he relied on information provided by Secret Service that the areas surrounding the BOK Center would be a "sterile area."  Dkt. # 112-3, at 11.  Witt states that he was informed by Secret Service that "anything inside of the no-scale fencing [was] a sterile area."  Id. at 12.  Secret Service informed Witt that the Trump campaign could uninvite anyone from the sterile area, for example, if someone was protesting or wearing anti-Trump clothing.  Id. at 16-17.  Members of the campaign or staff working with the Campaign could ask any person to leave the event and, if the person refused to leave, TPD officers would be called to arrest the person if he or she persisted in refusing to leave the event.  Id. at 18.  TPD officers were not directed to question requests by campaign staff to remove persons from the campaign rally or the area within the non-scalable fencing outside the BOK Center, but officers were also not prohibited

---

[2]      Defendants argue that the Secret Service was exempt from the requirement to obtain a city permit in order to obtain police protection and close streets, because the special event permit requirement does not apply to "activities conducted by governmental agency acting within the scope of its authority."  Dkt. # 112, at 9.  The evidence suggests that the Secret Service required additional security measures for the campaign rally, and it does not appear that the street closures and security measures were requested directly by the Trump Campaign.  The parties are advised the issues raised by plaintiff and the individual defendants, Parker and Rhoades, do not require the Court to resolve the parties' dispute concerning the reasonableness of the security measures employed for the campaign rally or whether the Trump Campaign was exempt from the permit requirement The Court is providing information about the "federally restricted" or "sterile" area merely as background.

4

from inquiring into the reason for removal.  Id. at 30-31.  Witt conducted a briefing for active and reserve officers who would be working the campaign rally to convey the information provided by Secret Service concerning the removal of persons from the event.  Id. at 33-35.  The written operation plan drafted by TPD contained a timeline for the event and a list of street closures, but the plan did not define or specify the location of federally restricted or "sterile" area.  Dkt. # 114-6.

Parker and Rhoades were TPD reserve officers who were assigned to work the campaign rally.  Parker has been a reserve officer for approximately 22 years, and Rhoades retired from his position as a reserve officer in March 2021 after serving in that role for 12 years.  Dkt. # 112-1, at 5; Dkt. # 112-2, at 3.  Reserve officers are volunteers who are required to obtain certification from the Counsel on Law Enforcement Education and Training (CLEET), but TPD reserve officers may not issue citations or respond to calls without the presence of a full-time police officer unless they have worked for 640 hours.  Dkt. # 112-2, at 7.  However, reserve officers were permitted to work special events without being accompanied by a full-time officer.  Id. at 8.  Reserve officers typically attend a meeting with their direct supervisor before a special event where the operations plan is reviewed.  Id.  The operations plan lists all of the full-time and reserve officers assigned to an event, where different officers were going to be stationed, and expectations for the event.  Dkt. # 112, at 13; Dkt. # 132, at 16.  On June 20, 2020, Rhoades attended a briefing and was given a handout with procedures for the campaign rally, and the officers were informed that the Trump Campaign hired its own security for the event.  Id. at 11-13.  However, officers were advised that event security could contact TPD if they needed assistance.  Id. at 13.  Parker was not present for the briefing due to another engagement and he was scheduled to arrive later in the day for the campaign rally.  Dkt. # 132-4, at 7-8.

The Secret Service created a restricted zone for several blocks in each direction around the BOK Center, and numerous streets were closed on the day of the rally.  Dkt. # 112-5, at 6; Dkt. # 114-6, at 2.  The security measures in place included non-scalable fencing, magnetometers, marked and un-marked police units, Secret Service agents, members of the National Guard, and state law enforcement officers.  Dkt. # 112-5, at 20.   Non-scalable fencing was placed on streets around the BOK Center from approximately Houston Avenue to Boulder Avenue from west to east and from First Street to Sixth Street from north to south, and magnetometers were placed closer to the BOK Center before attendees actually entered the event.  Dkt. # 112-3, at 14; Dkt. # 112-5, at 19.  Protesting was not permitted inside the secure area delineated by the non-scalable fencing, and protesters or anyone asked to leave by the Trump Campaign who was found within the non-scalable fencing was subject to removal by law enforcement officer.  Id. at 13-14; Dkt. # 112-5, at 11.  The decision to use certain security measures and the scope of the secure area was a "collective decision" on the part of TPD and the Secret Service, but Franklin explained that the Secret Service was "driving the boat . . . on what that footprint was going be."[3]  Dkt. # 132-2, at 3.

On the morning of June 20, 2020, Buck walked inside the area secured by non-scalable fencing as she walked toward the BOK Center to enter the campaign rally.  Dkt. # 114-13, at 2.  Buck had obtained a ticket to the campaign rally, and she was wearing a black shirt stating "I Cant'

---

[3]     Plaintiff devotes much of her briefing to the allegedly excessive scope of the secure area around the BOK Center and the lack of a need to secure such a broad area of downtown Tulsa for a campaign rally.  There is no evidence that Parker or Rhoades had any role in the decision making process in determining what security measures would be put into place on the day of the rally, and the Court finds no basis to hold them legally responsible for any error in the selection of the security procedures.  The Court is providing information about the security procedures as necessary background to understand plaintiff's claims against the officers, but the Court will focus solely on the conduct of the officers when deciding whether plaintiff has come forward with evidence supporting her claims against Parker and Rhoades.

Breathe." Dkt. # 114-14.  CSA staff spoke to Buck and asked her to change her shirt before entering

the event.  Dkt. # 114-4, at 12.  Buck refused to change her shirt and a CSA employee, Michael

Edwards, told Buck that she was "uninvited" from the campaign rally.  Id. at 13.  The request to

remove Buck from event came from a member of the Trump Campaign staff.  Id. at 17.  Buck did

not leave the event, and she sat down in the street and began praying.  Dkt. # 112-9, at 7.  Parker and

Rhoades were stationed at the gate near the non-scalable fencing near the intersection of Fourth

Street and Cheyenne Avenue.  Dkt. # 112-1, at 20-21.  Parker was a more senior reserve officer and

had been assigned a body camera for the event.  Dkt. # 112-2, at 15.  Parker was approached by

Edwards, and Edwards asked Parker to assist with removing Buck from the secure area outside of

the rally.  Dkt. # 112-1 at 14.  Parker contacted his supervisor, Witt, and was directed to arrest Buck

for trespassing if she refused to leave the area.  Dkt. # 114-12, at 3.  Parker spoke to Buck and asked

her to leave the fenced area, and he explained that Buck would be arrested for trespassing if she

refused to leave.  Dkt. # 114-13, at 2.  Parker told Buck that the Trump Campaign had a permit that

gave it control over the area.  Dkt. # 114-14.  However, Parker mistakenly assumed that the Trump

Campaign had obtained a permit, and City of Tulsa (the City) officials knew that the Trump

Campaign had not requested or obtained a special event permit.  Dkt. # 114-1, at 6-7; Dkt. # 114-2,

at 7.  Parker approached Buck and placed her under arrest for trespassing, and Parker and Rhoades

removed Buck from the fenced area on the city streets.  Dkt. # 112-1, at 18.  Buck was handcuffed

and placed in the front seat of a TPD patrol vehicle about a block and a half from the intersection

where plaintiff was initially arrested.  Dkt. # 112-10; Dkt. # 114-14.  Rhoades returned to his post

at the intersection of Fourth Street and Cheyenne Avenue.  Dkt. # 112-2, at 17.  Parker was directed

by Witt to book Buck on a charge of obstructing an officer, not trespassing, and Parker transported

Buck to the David L. Moss Criminal Justice Center for booking.  Dkt. # 114-12, at 13-14; Dkt. # 114-13.

Buck was subsequently charged in Tulsa County District Court with a misdemeanor offense of obstructing an officer and, on August 6, 2020, she was arraigned and pled not guilty to the charge. Dkt. # 124-2.  The case was eventually set for trial on May 1, 2023, and prosecutors asked the court to continue the trial due to the unavailability of a witness.  Dkt. # 110, at 4; Dkt. # 124, at 2.  The state court granted a two week continuance of the trial and reset the trial for May 15, 2023.  Dkt. # 124-2, at 8.  The state court held a hearing on May 15, 2023 and ruled on numerous pretrial motions. Id. at 10.  The docket entry is not entirely clear as to what occurred at the hearing, but the end result of the hearing was that the state court judge dismissed with prejudice the obstruction charge against Buck.[4]  Id. at 10.  The state appealed the dismissal with prejudice, and the Oklahoma Court of Criminal Appeals entered an order remanding the case with directions to dismiss the obstruction charge against Buck without prejudice to refiling.  State of Oklahoma, ex rel. Steve Kunzweiler, District Attorney v. Honorable Tanya Wilson, Special Judge, No. PR-2023-501 (Aug. 22, 2023). The state court docket sheet shows that a hearing is set for November 2, 2023, and it is unclear from the docket sheet whether the state will proceed with the misdemeanor charge against Buck.

---

[4]   The docket entry states that prosecutors requested a continuance due to the unavailablity of witness, and the "court advise[d] the state that if witness is not available then the court would entertain a motion to dismiss."  Dkt. # 124-2, at 10.  The entry concludes with a ruling that the case was dismissed with prejudice over the objection of the state.  Id.

Buck filed this case in Tulsa County District Court alleging claims under 42 U.S.C. § 1983 against Rhoades, Parker, and the City, and defendants removed the case to this Court.[5]  Buck filed an amended complaint (Dkt. # 1) in state court before removal alleging that Parker and Rhoades violated her rights under the First Amendment by unlawfully removing her from a public street while she was protesting and for prohibiting her from exercising her religious beliefs, and she claims that Parker and Rhoades arrested her without probable cause to believe that she had committed a crime. Dkt. # 1, at 8-9.  Buck also alleges that the City approved or cooperated with the Trump Campaign in carrying out an unlawful policy of removing persons from the campaign rally who were exercising their First Amendment right of free speech to protest against former president Trump, and she claimed that the City violated her Fifth and Fourteenth Amendment rights by depriving her of property in violation of her right to due process.  Id. at 15-16.  The City, Parker, and Rhoades filed a motion to dismiss (Dkt. # 8), requesting the dismissal of all claims asserted by Buck. The motion to dismiss was granted in part and denied in part.  Dkt. # 57.  The Court dismissed plaintiff's free exercise claim and a due process claim concerning the deprivation of property, and plaintiff was not granted leave to amend to reassert those claims.  However, the Court denied the motion to dismiss as to plaintiffs' free speech and wrongful arrest claims under § 1983, and the City, Parker, and Rhoades were not dismissed as parties to this case.[6]

---

[5]     Buck also alleged claims CSA, the Trump Campaign and its employees, and two unnamed Secret Service agents.  However, those claims have been dismissed, and Parker, Rhoades, and the City are the only remaining defendants.  Dkt. # 57.

[6]     The parties are advised that the Court's ruling on the motion to dismiss was based on the allegations of the amended complaint.  Plaintiff attempts to rely on the ruling on the motion to dismiss as binding on the defendants in several key aspects.  Dkt. # 132, at 12, 19-23, 32-34.  Plaintiff's reliance on the Court's prior opinion and order is misplaced.  Plaintiff's allegations and the arguments raised in the briefing on the motion to dismiss differ

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court

---

substantially from the evidence contained in the summary judgment record, and the rulings contained in the opinion and order (Dkt. # 57) are not binding on the parties as the law of the case. Taylor v. City of Saginaw, Michigan, 11 4th 483, 487 n.1 (6th Cir. 2021) ("Typically, a ruling that denies a motion to dismiss under [Fed. R. Civ. P. 12(b)(6)] is not law of the case where discovery and further proceedings occur"); Alsobrook v. Alvarado, 656 F. App'x. 489, 493 n.3 (11th Cir. Aug. 12, 2016) (ruling denying a motion to dismiss is not a final order and is not binding at the summary judgment stage).

is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Parker and Rhoades argue that they had probable cause to arrest Buck for trespassing and obstructing a police officer, and they argue that this is a complete defense to plaintiff's claims against them.  Dkt. # 112, at 18-19.  They also argue that they are entitled to qualified immunity from plaintiff's § 1983 claims, because plaintiff cannot meet her burden to establish that a violation of her constitutional rights occurred or that the law supporting the violation was clearly established.  Id. at 20-22.  Buck has filed a motion for summary judgment on her claims against Parker and Rhoades, and she alleges that they engaged in viewpoint discrimination in violation of her right to free speech by arresting her when she was engaged in a lawful protest on a city street.  Dkt. # 114, at 15.  She also argues that the officers incorrectly assumed that the Trump Campaign had a special event permit from the City, and they had no basis to arrest her for trespassing while she was protesting in a public space.  Id. at 21-23.

## A.

Plaintiff argues that she was engaged in a lawful protest on a public street when she was arrested, and she claims that she was arrested for expressing views that contradicted the message of

the Trump Campaign.[7]  Dkt. # 132, at 20-22.  She claims that her arrest for trespassing was presumptively unconstitutional, and she asks the Court enter summary judgment as to liability on her § 1983 claims against Parker and Rhoades.  Parker and Rhoades argue that plaintiff was asked to leave a secure area by CSA, and they reasonably believed that CSA, acting on the direction of the Trump Campaign, had the right to exclude or "uninvite" persons from the campaign rally.  Dkt. # 112, at 18.  They argue that plaintiff has failed to show that they acted with the requisite intent to engage in viewpoint discrimination, because they were acting upon orders from a supervisor to remove plaintiff from a secure area regardless of the content of her speech.  Dkt. # 138, at 3-4.

Section 1983 provides a cause of action against any "person who, under color of statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States  . . . thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  "The purpose of § 1983 is to deter state actors from using the badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992). The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

[7]     Plaintiff argues that defendants have conceded that they engaged in viewpoint discrimination, because they failed to substantially dispute this issue in their motion for summary judgment (Dkt. # 112) or their response (Dkt. # 129) to plaintiff's motion for summary judgment.  Dkt. # 132, at 19.  This misrepresents the arguments raised by defendants, and neither the individual defendants nor the City have conceded that viewpoint discrimination occurred. The individual defendants have chosen to assert arguments where plaintiff's speech activity may be less relevant, and this is not a concession that plaintiff was engaged in protected activity under the First Amendment.

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity shields public officials from facing the burdens of litigation and is an immunity from suit, not simply a defense to a plaintiff's claims.  Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1150 (10th Cir. 2006).  The Tenth Circuit applies a two-step analysis to determine if a defendant is entitled to qualified immunity.  A plaintiff must show that the defendant's actions violated a specific constitutional right and, if the plaintiff has shown that a constitutional violation occurred, the plaintiff must show that the constitutional right was clearly established when the conduct occurred.  Toevs. v. Reid, 685 F.3d 903, 909 (10th Cir. 2012).  Plaintiff bears the burden to prove that her constitutional rights were violated and that the law giving rise to her claims was clearly established at the time the acts occurred.  Cox v. Glanz, 800 F.3d 1231, 1246 (10th Cir. 2015); Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).

Plaintiff claims that she had a right to protest on a public street regardless of whether she had been "uninvited" to the campaign rally, and she alleges that Parker and Rhoades arrested her in violation of her right to engage in free speech under the First Amendment.  "The First Amendment, applicable to the States under the Due Process Clause of the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble . . .'"  McCraw v. City of Oklahoma City, 973 F.3d 1057, 1065 (10th Cir. 2020) (quoting U.S. CONST. amend. I).  To demonstrate a First Amendment violation, plaintiff "must first establish that [her] activities are protected by the First Amendment. If so, a court must identify whether the challenged restrictions affect a public or nonpublic forum; that determination dictates the extent to which the government can restrict First Amendment activities within the forum."  Id.  "Finally, courts must determine whether the proffered justifications for prohibiting speech in the

forum satisfy the requisite standard of review." Id. at 1066.  Under the First Amendment, protected expression includes written and spoken words, as well as symbolism.  Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, 515 U.S. 557, 569 (1995).

The parties do not dispute that plaintiff was engaged in speech activity under the First Amendment because of the message on her shirt and her protest after Edwards told her she could not attend the campaign rally.  Plaintiff contends Parker and Rhoades arrested her because of the contents of her speech, and she claims that their actions constitute prohibited viewpoint discrimination in violation of plaintiff's right to free speech.  Dkt. # 132, at 19-23.  A basic freedom guaranteed by the First Amendment is that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  Animal Legal Defense Fund v. Kelly, 9 F.4th 1219, 1227 (10th Cir. 1228) (quoting United States v. Stevens, 559 U.S. 460, 468 (2010)).  "Discrimination against speech because of its message is presumed to be unconstitutional," and "[w]hen the government targets not subject matter, but the particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."  Rosenberger v. Rector and Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995).  A plaintiff asserting a viewpoint discrimination claim against a governmental official under § 1983 must show that the defendant acted with a "viewpoint-discriminatory purpose." Pahls v. Thomas, 718 F.3d 1210, 1230 (10th Cir. 2013).  In cases against multiple government officials, the plaintiff "must show that the defendant's individual actions caused viewpoint discrimination to occur, and that those actions were taken 'because of, not merely in spite of,'" the plaintiff's message.  Id. at 1230-31.

The Court initially notes that there are multiple actors involved in the alleged violation of plaintiff's First Amendment rights, and the Court must distinguish between the conduct of the Trump

14

Campaign, the City, and Parker, and Rhoades.  Plaintiff essentially seeks to hold Parker and Rhoades liable for enforcing an allegedly unconstitutional City policy, but the Court is obligated to consider whether each defendant personally and with the requisite intent violated plaintiff's constitutional rights.  Id. at 1231-32.  It is undisputed that the Trump Campaign sought plaintiff's removal from the campaign rally because of the content of her speech and, if the Trump Campaign were a governmental entity, this would constitute viewpoint discrimination.  However, as plaintiff repeatedly points out, the Trump Campaign is a private entity and the First Amendment does not prohibit private parties from restricting speech when the private entity provides a forum for speech. Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1930 (2019).  Plaintiff's motion for summary judgment focuses heavily on the conduct of City officials and whether the area outside of the BOK Center remained a public forum for speech due to the Trump Campaign's failure to obtain a City permit.  These issues may or not be material to plaintiff's claims against the individual officers who arrested her.  In order to prevail against Parker and Rhoades, plaintiff must do more than show that the Trump Campaign discriminated against her because of the content of her speech, and she must show that each defendant acted with a "discriminatory purpose."  Pahls, 718 F.3d at 1230.  The purpose requirement has been described as "demanding," and a discriminatory purpose "requires more than intent as volition or intent as awareness of consequences."  Id. (quoting Ashcroft v. Iqbal, 556 U.S.. 662 (2012)).

Plaintiff devotes most of her argument on her First Amendment claim to the Trump Campaign's lack of a permit and the status of the street where she was arrested as a public or non-public forum. The Court has reviewed the parties' arguments and finds that it is unnecessary to resolve the issue of whether plaintiff was engaged in a protest in a public or non-public forum,

because this issue is not relevant to plaintiff's claims against Parker and Rhoades. The more relevant inquiry is what information had been provided to Parker and Rhoades prior to the campaign rally and whether this information would have led a reasonable police officer to believe that Buck had a right to engage in speech activity where she was arrested. It is undisputed that the City did not issue a permit to the Trump Campaign, but there is no evidence that officers assigned to work outside of the campaign rally were informed of this fact. Instead, officers were instructed that the Trump Campaign could ask to have any person removed from the rally if he or she was protesting. Parker testified at his deposition that officers were not typically briefed about whether an event organizer has obtained a city permit, but he assumes that his supervising officer is aware of this information. Dkt. # 112-1, at 7-8, 11. Parker assumed at the time of the event that the Trump Campaign did have a permit, but later became aware the Trump Campaign did not obtain a permit prior to the event. Id. at 17. The evidence is undisputed that Parker contacted his supervisor, Witt, before he approached plaintiff, and Witt ordered Parker to arrest plaintiff for trespassing if she refused to leave voluntarily. Plaintiff argues that Parker did not have "reasonably trustworthy information" concerning her right to engage in a protest on a public street, and she faults Parker for not conducting a more substantial investigation as to the permitted or non-permitted status of the campaign rally. Dkt. # 132, at 24-24. However, she has cited no authority that a reasonable police officer in similar circumstances would have believed such an inquiry was necessary before he followed orders from a supervisor to remove a protester from a secured area. The evidence shows that Parker had a reasonable, but possibly mistaken, belief that the Trump Campaign had the authority to request the removal of a person from a secured area.

The critical issue for a § 1983 claim against an individual defendant is whether that defendant acted with the intent or purpose to violate the plaintiff's First Amendment speech rights. Plaintiff makes little or no effort to show that either Parker or Rhoades purposefully intended to violate her right to free speech by arresting her and removing her from a city street while she was walking toward the BOK Center to attend the campaign rally. Plaintiff argues that she was engaged in protected activity under the First Amendment when she was approached by Parker, and she claims that Parker "targeted" her for removal from the street based on the content of her speech. This argument is not supported by the evidence. The evidence establishes that Parker was directed to arrest plaintiff because of the location of her protest, not the message or viewpoint she was attempting to convey, and it not clear that Parker was even aware of the message on her shirt when he arrested plaintiff. The evidence is even more scant as to plaintiff's claim against Rhoades. Rhoades was simply a backing officer, and he assisted Parker with the removal of Buck from the secure area inside the non-scalable fencing. Plaintiff has offered no evidence that Rhoades knew of the message she was attempting to convey or that the content of plaintiff's speech played any role in Rhoades' decision to assist in the removal of plaintiff from the area inside the non-scalable fencing. The Court finds no evidence tending to show that either Parker or Rhoades acted with the intent to prohibit plaintiff from engaging in protected speech activity, and this means that plaintiff cannot show that Parker and Rhoades purposefully violated her right to engage in free speech under the First Amendment. Parker and Rhoades are entitled to summary judgment on plaintiff's claim asserting a violation of First and Fourteenth Amendment rights.

**B.**

Parker and Rhoades argue that they had probable cause to arrest plaintiff for trespassing and obstructing an officer, and they assert that this is a complete defense to the claims raised by plaintiff. Dkt. # 112, at 17-19.  Plaintiff argues that the officers failed to conduct a reasonable investigation before arresting her, and the officers did not have a sufficient factual basis that would lead a reasonable police officer to believe that probable cause existed to arrest plaintiff.  Dkt. # 132, at 24-25.  She claims that Parker and Rhoades had no evidence that the Trump Campaign obtained a City permit for its event, and any reasonable police officer would have known that plaintiff was lawfully exercising her rights under the First Amendment when she was arrested.  Id. at 28-30.

The Fourth Amendment protects the "right of the people to be secure . . . against unreasonable searches and seizures . . . ."  U.S. CONST. amend. IV.  In the context of a false arrest claim, "an arrestee's constitutional rights were violated if the arresting officer acted in the absence of probable cause that the person had committed a crime."  Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012). Probable cause exists when a police officer has sufficient information "to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."  Beck v. Ohio, 379 U.S. 89, 91 (1964).  This is an objective standard and a court must consider the totality of the circumstances to determine whether a reasonable officer would have believed there was probable cause to make an arrest.  Koch v. City of Del City, 660 F.3d 1228, 1239 (10th Cir. 2011).  Probable cause "is measured at the moment the arrest occurs and must derive from facts and circumstances based on reasonably trustworthy information."  Cortez v. McCauley, 478 F.3d 1108, 1121 (10th Cir. 2007).  Once probable cause is established, a police officer is not required to search for exculpatory evidence before arresting a suspect.  Id.  A defendant is entitled to qualified

18

immunity from a false arrest claim if there was "arguable probable cause" to make an arrest. Kaufman, 697 F.3d at 1300. "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014). "The proper inquiry in a § 1983 claim based on false arrest is not whether the person arrested actually committed an offense, but whether the arresting officer had probable cause to believe that he had." Crawford ex. rel. Crawford v. Kansas City, Kansas, 952 F. Supp. 1467, 1474 (D. Kan. 1997) (citing Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988)).

Parker and Rhoades seek qualified immunity from plaintiff's § 1983 claims, and the law is clear that a police officer making a warrantless arrest is entitled to qualified immunity if he "reasonably but mistakenly" concludes that he had probable cause to make an arrest. A.M. v. Holmes, 830 F.3d 1123, 1139-40 (10th Cir. 2016). "In other words, in the § 1983 qualified-immunity context, an officer's mistake is reasonable–viz., so long as he possesses 'arguable probable cause.'" Id. at 1140 (quoting Cortez, 478 F.3d at 1121). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officers at the time of the arrest." Devenpck v. Alford, 543 U.S. 146, 593 (2004). In this case, Parker and Rhoades were presented with a complex scenario in terms the facts and the law, and they had been instructed that event security could contact TPD officers on the scene for assistance in removing persons from the secure area outside of the campaign rally. Dkt. # 132-4, at 7-8. Parker mistakenly assumed that the Trump Campaign had a permit for the event, and he sought advice from his supervising officer when an employee of CSA approached Parker and asked him to remove Buck from the event. Id. at 112-1, at 14; Dkt. # 114-12, at 3. Witt ordered Parker to arrest plaintiff for trespassing if she refused to

19

leave voluntarily, and plaintiff clearly refused to comply with Parker's request to leave. Parker made the decision to arrest plaintiff after she refused to leave the area voluntarily.

Under TULSA, OKLA., CODE OF ORDINANCES tit. 27, ch. 21, §2106(e), it is unlawful to "[r]emain[] upon the premises of another, whether public or private, and refusing to leave the premises forthwith after demand by the owner or occupant." Parker had a reasonable but mistaken belief that the Trump Campaign had a permit for the campaign rally, and he was given a direct order by a supervisor creating the impression that plaintiff was protesting on a street that was being treated as private property. The Trump Campaign sought the removal of plaintiff from the campaign rally, and Parker formed a reasonable, even if possibly mistaken belief, that the Trump Campaign had the authority to request plaintiff's removal from the secure area leading to the BOK Center. Plaintiff was ultimately booked on a charge of obstructing on officer in violation of OKLA. STAT. tit. 21, § 540, which provides that "[e]very person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his or her office" is guilty of a misdemeanor. The parties do not dispute that a magistrate later found that probable cause existed to support further proceeding on this charge. Dkt. # 112, at 16; Dkt. # 132, at 18. "Once a magistrate judge determines probable cause exists, the role of a reviewing court is merely to ensure the Government's affidavit provided a 'substantial basis' for reaching that conclusion." United States v. Biglow, 562 U.S. 1272, 1281 (10th Cir. 2009). Parker's affidavit states that he made contact with plaintiff and asked her to leave the area, because the campaign rally was a private event and she was not permitted to attend the event. Dkt. # 132-6, at 4. Parker told plaintiff that Parker and Rhoades would physically remove her from the area if she declined to leave voluntarily, and she against refused to comply with Parker's command to leave. Id. These facts provided a sufficient basis for the magistrate to determine that

plaintiff had refused to comply with Parker's lawful exercise of his duty as a police officer and that plaintiff's actions were willful or intentional.  Plaintiff now argues that the magistrate's finding as to probable cause should be given no deference, because Parker's affidavit omitted the facts that the Trump Campaign did not have a permit and she was denied entry to the campaign rally because of the message on her shirt.  Dkt. # 132, at 18.  The Court has already determined that Parker had a reasonable but mistaken belief that the Trump Campaign had a permit and that the arresting officers, Parker and Rhoades, were not engaged in viewpoint discrimination in violation of plaintiff's First Amendment rights.  Plaintiff has not shown that the omission of these matters detracts from the magistrate's probable cause determination, and Parker had probable cause to arrest plaintiff on a charge of obstructing an officer.  The Court concludes that Parker and Rhoades had arguable probable cause to arrest plaintiff on charges of trespassing and obstructing an officer, and she has not established a claim of wrongful arrest in violation of the Fourth Amendment.

## C.

Plaintiff has not met her burden to show that her constitutional rights were violated, and Parker and Rhoades are entitled to qualified immunity on this basis alone.  However, even if plaintiff could have established that a constitutional violation occurred, the Court also would not find that law giving rise to plaintiff's claims was clearly established when the events took place.  The Tenth Circuit has explained that law is clearly established if the contours of a constitutional right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Perry v. Durborow, 892 F.3d 1116, 1123 (10th Cir. 2018).  The contours of a right are generally "sufficiently clear" only if the plaintiff "identif[ies] an on-point Supreme Court or published Tenth Circuit decision" or "shows 'the clearly established weight of authority from other

courts [has] found the law to be as plaintiff maintains . . . .'" Id.  District courts have been cautioned not to define a constitutional right "at a high level of generality" but, instead, "the clearly established law must be 'particularized' to the facts of the case." Id.  To find that the law is clearly established, the district court must "identify a case where an offic[ial] acting under similar circumstances as [defendant]" was held to have violated the constitutional right at issue.  Id. at 1124.

Plaintiff relies primarily on Jordan v. Jenkins, 73 F.4th 1162 (10th Cir. 2023), to support her argument that "(1) police cannot remove a citizen from a quintessential public forum because of the viewpoint she is expressing, (2) police must have probable cause to carry out a warrantless arrest, and (3) Ms. Buck's 'refusal to leave when asked to do so could not have provided arguable probable cause for [her] arrest."  Dkt. # 132, at 34 (citations omitted).  Plaintiff's argument that the law supporting her claims is clearly established is based on a series of assumptions that are not supported by the summary judgment record and, even if they were, Jordan does not lend any support to plaintiff's argument that the law supporting her claims was clearly established.  Jordan was decided on July 18, 2023, well after the incident occurred which gave rise to this case.  The Tenth Circuit has plainly stated that cases decided after the incident giving rise to the claim occurred are of "no use in the clearly established inquiry."  Lewis v. City of Edmond, 48 F.4th 1193, 1199 (10th Cir. 2022).

Therefore, the Court may not consider Jordan to determine whether the law was clearly established on June 20, 2020 when plaintiff was arrested.[8]  Plaintiff cites authority standing for the general proposition that governmental actors may not engage in viewpoint discrimination, but the Court has determined that there is no evidence suggesting that Parker or Rhoades were aware of the message plaintiff was attempting to convey or that they arrested her because of the contents of her speech. Plaintiff has not shown that the law was clearly established that a police officer, who receives a command to remove a protester from a secure area and obeys that command, acts with the intent to violate the protester's First Amendment rights, and plaintiff has not met her burden to show that the law giving rise to her § 1983 claims was clearly established at the time of her arrest.

## IV.

The City asks the Court to stay this matter pending resolution of the criminal case against plaintiff.  Dkt. # 110.  The City has also filed three motions in limine (Dkt. ## 121, 122, 123) to exclude evidence at trial.  Plaintiff responds that defendant's motions in limine are vague and conclusory, and the Court should defer a ruling on the issues raised in the motions in limine until

---

[8]    Even if Jordan were decided before June 20, 2020, the Court has reviewed the case and it does not tend to show that the law supporting plaintiff's claims against Parker and Rhoades was clearly established.  The plaintiff, John Jordan, was witnessing police officers interact with his nephew and he was criticizing the officers throughout the encounter, and the police officers subsequently used force to arrest Jordan on a charge of obstruction of justice. Jordan, 73 F.4th at 1166-67.  Jordan alleged that he was arrested in retaliation for exercising his First Amendment right of free speech to verbally criticize or challenge police officers, and the Tenth Circuit agreed that his allegations could implicate Jordan's right to observe and comment upon police conduct.  Id. at 1169-70.  In this case, plaintiff was not observing Parker or Rhoades or commenting on their conduct, and she was apparently making a general protest against the Trump Campaign.  Plaintiff was not exercising any First Amendment rights as it related to the conduct of Parker or Rhoades, and Jordan would not have suggested to Parker or Rhoades that removing a protester from a secure area was a violation of plaintiff's constitutional rights.

trial.  Plaintiff also argues that criminal charge against her has been dismissed with prejudice, and the City has not explained why it waited over two years to request a stay based on the criminal proceedings.  Dkt. # 124.

"The purpose of a motion in limine is to aid the trial process by enabling the Court 'to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitively set for trial, without lengthy argument at, or interruption of, the trial.'"  Mendelsohn v. Sprint/United Management Co., 587 F. Supp. 2d 1210, 1208 (D. Kan. 2008).  However, a court is almost always better situated to make evidentiary rulings during trial, and a court may defer an in limine ruling unless the party seeking to exclude evidence shows that the evidence is inadmissible on all potential grounds.  Wright v. BNSF Railway Co., 2016 WL 1611595, *1 (N.D. Okla. Apr. 22, 2016). Defendant removed this case to federal court based on diversity jurisdiction, and the admissibility of evidence is generally governed by federal law.  Blanke v. Alexander, 152 F.3d 1224, 1231 (10th Cir. 1998).  State law concerning the admissibility of evidence will be considered only if the issue involves a "substantive" state rule of evidence, such as the collateral source rule or the parol evidence rule.  Id.  The parties are advised that all ruling on the motions in limine are preliminary.[9]

**Motion to Stay (Dkt. # 110)**

The City asks the Court to stay this case pending a ruling on its appeal of the state trial court's decision with prejudice to dismiss the criminal charge against plaintiff.  The Court has

---

[9] The Court has reviewed the motions in limine (Dkt. ## 121, 122, 123) and finds that the motions should be denied without prejudice to refiling.  The motions are simply too conclusory and seek to exclude large categories of evidence without any substantial analysis of the issues raised.  The Court will offer the parties guidance as to general issues raised by the City, but it would be premature to exclude the large categories of evidence identified in the motions.

reviewed the publicly-available docket sheet of plaintiff's criminal matter and it appears that the appeal has been resolved. The Oklahoma Court of Criminal Appeals has entered an order remanding the criminal case with directions to dismiss the obstruction charge against plaintiff without prejudice to refiling. State of Oklahoma, ex rel. Steve Kunzweiler, District Attorney v. Honorable Tanya Wilson, Special Judge, No. PR-2023-501 (Okla. Crim. App. Aug. 22, 2023). The state's appeal has been resolved, and it appears that City's motion to stay this case is moot. The City has not filed a supplement to its motion updating this Court as to whether the State of Oklahoma has or intends to refile the criminal charge against plaintiff, and the City has not asserted any other basis upon which a stay may be appropriate. Even if the charge is refiled, the Court is unlikely to stay this case unless the City can show that it will be substantially prejudiced if this case is permitted to proceed. The City's motion to stay (Dkt. # 110) is moot.

**Motion to Exclude Emails Regarding Buck's Arrest (Dkt. # 121)**

The City asks the Court to exclude emails concerning plaintiff's arrest that were sent to City officials by members of the public. Dkt. # 121, at 2. The City has attached an e-mail from an unidentified citizen making a complaint to a former city councilor, Ben Kimbro, about plaintiff's arrest, and the citizen alleges that the City will ultimately be held liable for its negligent conduct in providing security for the campaign rally. Dkt. # 121-1. The Court agrees that anonymous e-mails critical of the City's conduct in relation to the campaign rally will likely not be relevant at trial. However, it would be premature to exclude all e-mails sent to the City concerning plaintiff's arrest, especially if those e-mails include a response from City officials that may be relevant. The parties are advised that any witness' opinion about the event security or plaintiff's arrest will likely be inadmissible if the opinion is merely offered to prejudice the opposing party, and the jury will have

to evaluate the facts, not the opinions of the witnesses, to determine if the City violated plaintiff's constitutional rights.

**Motion to Exclude Text Messages from Current and Former City Employees (Dkt. # 122)**

The City seeks to exclude text messages from former and current City employees discussing the arrest of plaintiff and security procedures outside of the campaign rally.  The City's entire argument on this issue is that the "texts were sent after [plaintiff] was arrested and are not relevant to any claim or defense in this case, thus they are not admissible evidence." Dkt. # 122, at 2.  The Court has reviewed the text messages and cannot conclusively if the texts are wholly  inadmissible.  The texts identify the senders of the messages by name, but the City has not identified the senders' roles in the City government and if these people had decision-making authority over security measures in place outside the campaign rally.  Dkt. # 122-1.  At least some of the text messages were sent on June 20, 2022 and could be relevant to the City's awareness of potential security issues on the day of the campaign rally, and the Court finds that it will be necessary to determine at trial whether the text messages are admissible.

**Motion to Exclude Mayor's Opinion of Buck's Arrest (Dkt. # 123)**

The City asks the Court to exclude testimony by Tulsa's mayor, G.T. Bynum, concerning his opinions concerning the legality of Buck's arrest and whether she should have been prosecuted.  The City was not the governmental entity that charged plaintiff with a crime, and it does not appear that Bynum's opinion on this issue has any relevance to plaintiff's claims.  However, Bynum was likely involved in the decision-making process in the selection of security measures for the campaign rally, and his understanding of what police procedures would be in place and the Trump Campaign's authority to remove protesters will likely be relevant at trial.  The parties are advised that Bynum's

testimony will concern his official involvement with police procedures for the campaign rally, and his personal opinions about those procedures or Buck's arrest will not be admissible at trial.

**IT IS THEREFORE ORDERED** that Defendants C.J. Rhoades' and M.C. Parker's Combined Motion for Summary Judgment and Brief in Support (Dkt. # 112) is **granted**, and Plaintiff's Motion for Partial Summary Judgment on Her Claims against Defendants Parker and Rhoades and Brief in Support (Dkt. # 114) is **denied**. Summary judgment is entered for defendants C.J. Rhoades and M.C. Parker, and they are terminated as parties to this action.

**IT IS FURTHER ORDERED** that Defendants' Opposed Motion to Stay Proceedings until Resolution of State Criminal Case (Dkt. # 110) is **moot**.

**IT IS FURTHER ORDERED** that Defendants C.J. Rhoades, M.C. Parker, and the City of Tulsa's Motion in Limine to Exclude Emails Regarding Sheila Buck's Arrest (Dkt. # 121), Defendants C.J. Rhoades, M.C. Parker, and the City of Tulsa's Motion in Limine to Exclude Regarding Text Messages Regarding Sheila Buck's Arrest (Dkt. # 122), and Defendants C.J. Rhoades, M.C. Parker, and the City of Tulsa's Motion in Limine to Exclude Mayor Bynum's Opinions Regarding Sheila Buck's Arrest (Dkt. # 123) are **denied without prejudice** to renewing these evidentiary issues at trial.

**IT IS FURTHER ORDERED** that the only claim remaining for trial is plaintiff's § 1983 claim (count VII) against the City, and the parties shall correct the case caption accordingly on future pleadings. An amended scheduling order  resetting all unexpired deadlines (as of entry of Dkt. # 142) will be entered forthwith.

**DATED** this 25th day of September, 2023.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE